# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00076-CV

**Appellant, Texas Association of Appraisal Districts, Inc., // Cross-Appellant, Coach Dan Hart**

**v.**

**Appellee, Coach Dan Hart // Cross-Appellees, Texas Association of Appraisal Districts, Inc., and Property Tax Education Coalition**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT NO. D-1-GN-10-000781, HONORABLE JOSEPH H. HART, JUDGE PRESIDING

## O P I N I O N

In this case, we decide whether appellant/cross-appellee Texas Association of Appraisal Districts, Inc. (TAAD) and cross-appellee the Property Tax Education Coalition (PTEC) are "governmental bodies" subject to disclosure of public information under the Texas Public Information Act (PIA). *See* Tex. Gov't Code Ann. § 552.003(1) (West 2012); *see generally id.* §§ 552.001–.353 (West 2012). Appellee/cross-appellant Hart brought suit against TAAD and PTEC seeking disclosure under the PIA of those entities' financial records for the years 2007 through 2010. The district court's final judgment denied Hart's requested relief as to PTEC, but granted relief as to TAAD and ordered TAAD to disclose the requested information. Both TAAD and Hart appeal from the district court's final order. We will affirm the district court's judgment in part and reverse and remand in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

TAAD is a nonprofit corporation whose mission is to "promote the effective and efficient functioning of appraisal districts and aid in the improvement of the administration thereof in the State of Texas." The following persons and entities are eligible for voluntary membership in TAAD: Texas appraisal districts; current and retired employees of appraisal districts and taxing entities, members of Appraisal Review Boards, and state agencies; and persons actively engaged in the property tax profession, subject to TAAD approval. Approximately 90% of Texas's appraisal districts are members of TAAD. TAAD members are required to pay annual membership dues, in return for which they receive a subscription to a bi-monthly newsletter, updates on legislative issues of interest to TAAD members, and discounts on an annual conference and on TAAD education courses. TAAD also receives revenue from conference and course registrations, advertising in its newsletter, and book sales. Some of TAAD's revenue comes from public entities that use public fees to pay for membership dues or TAAD's other products.

PTEC is also a non-profit corporation. It was initially formed by seven trade associations as a voluntary unincorporated association to develop curricula and educational materials related to licensing requirements for property-tax professionals.[1] PTEC produces course materials on property-tax issues, but rather than conduct the courses itself, PTEC licenses its materials to various organizations that sponsor or conduct educational and training courses. PTEC's sole source of revenue is the licensing fees it receives from the sponsoring organizations, which are based on the

---

[1] PTEC's member trade associations, some of which are public entities, are TAAD, the Tax Assessor Collectors Association, the Texas Association of Assessing Officers, the Texas Association of Municipal Tax Administrators, the Texas School Assessors Association, the Texas Council of Metropolitan Appraisal Districts, and the Texas Rural Chief Appraisers. PTEC incorporated in 2009.

number of students attending the course. Some of those licensing fees are paid by public entities using public funds. PTEC has no employees; instead, TAAD employees provide administrative services to operate PTEC. PTEC entered into a memorandum of understanding with the Office of Comptroller of Public Accounts that, generally stated, requires PTEC to develop curricula and educational courses and that allows PTEC to charge a reasonable fee for the courses, materials, and examinations it prepares.

In February 2010, Hart submitted a public-information request to TAAD and PTEC seeking those entities' financial records for the years 2007 through 2010. Both TAAD and PTEC refused to produce these records, asserting that they were not governmental bodies subject to the PIA. Neither TAAD nor PTEC requested a PIA ruling from the Attorney General regarding Hart's request. *See* Tex. Gov't Code Ann. § 552.306(a) (requiring Attorney General to render opinion regarding whether requested information is subject to PIA). Hart then filed this suit in Travis County district court seeking a writ of mandamus to compel production of the requested information under the PIA. After a bench trial, the district court issued a final judgment ordering TAAD to produce the requested documents, but ordering that Hart take nothing on its claim against PTEC. The district court declined to award Hart attorney's fees. It is from this judgment that TAAD and Hart now appeal.

## ANALYSIS

The parties' issues on appeal can be summarized as asking this Court to determine whether (1) TAAD and PTEC, respectively, are "governmental bodies" under the PIA, and (2) whether Hart is entitled to attorney's fees under the PIA.

3

**Standard of review**

Whether an entity is a "governmental body" under section 552.003 of the PIA is a matter of statutory construction that we review de novo. *See City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 357 (Tex. 2000) (noting that matters of statutory construction are legal questions, and specifically that whether information is subject to PIA is a question of law); *see also State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006) (holding that statutory construction is a matter of law, which is reviewed de novo). Our primary objective in statutory construction is to give effect to the Legislature's intent. *See Shumake*, 199 S.W.3d at 284. We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We use statutory definitions provided. *See* Tex. Gov't Code Ann. § 311.011(b) (West 2005). Where statutory text is clear, it is determinative of legislative intent unless the plain meaning of the statute's words would produce an absurd result. *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). Only when statutory text is susceptible to more than one reasonable interpretation is it appropriate to look beyond its language for assistance in determining legislative intent. *See In re Smith*, 333 S.W.3d 582, 586 (Tex. 2011). Further, in construing the PIA, we give due consideration to the Attorney General's PIA decisions, even though they are not binding, because the Legislature has directed the Attorney General to determine whether records must be disclosed pursuant to PIA. *See* Tex. Gov't Code Ann. §§ 552.008(b-2), .306 (requiring Attorney General to render decisions regarding PIA); *Abbott v. City of Corpus Christi*, 109 S.W.3d 113, 121 (Tex. App.—Austin 2003, no pet.); *Rainbow Grp. Ltd. v. Texas Emp't Comm'n*, 897 S.W.2d 946, 949 (Tex. App.—Austin 1995, writ denied); *see also Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624–25 (Tex. 2011) (giving "serious consideration" and

"some deference" to agency's "interpretation of a statute it is charged with enforcing" "so long as the construction is reasonable and does not conflict with the statute's language").

The Texas Legislature promulgated the PIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." Tex. Gov't Code Ann. § 552.001(a); *Jackson v. State Office of Admin. Hearings*, 351 S.W.3d 290, 293 (Tex. 2011) (citing *City of Garland*, 22 S.W.3d at 355–56). The Act is aimed at preserving a fundamental tenet of representative democracy: "that the government is the servant and not the master of the people." Tex. Gov't Code Ann. § 552.001(a); *Jackson*, 351 S.W.3d at 293. At its core, the PIA reflects the public policy that the people of Texas "insist on remaining informed so that they may retain control over the instruments they have created." Tex. Gov't Code Ann. § 552.001(a); *see Jackson*, 351 S.W.3d at 293 (citing *Texas Comptroller of Pub. Accounts v. Attorney Gen. of Tex.*, 354 S.W.3d 336, 343 (Tex. 2010)). To that end, the PIA directs that it be liberally construed in favor of disclosure of requested information. Tex. Gov't Code Ann. § 552.001; *Jackson*, 352 S.W.3d at 293 (citing *City of Garland*, 22 S.W.3d at 356).

**"Governmental body"**

Under the PIA, public information is available to all members of the public. *See* Tex. Gov't Code Ann. §§ 552.001, .021, .221(a). The PIA defines "public information" as "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business . . . by a governmental body." *Id*. § 552.002(a)(1). "Governmental body" in turn is defined to include, among other entities not relevant here, "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds." *See id.* § 552.003(1)(A)(xii).

5

The parties here join issue on whether TAAD and PTEC are entities that are "supported in whole or in part by public funds."

Hart emphasizes that the word "supported" should be construed according to its "common" meaning, which he contends includes "to promote the interests or cause of," to "assist, help," "to hold up," "to pay the costs of: maintain," or "to keep something going." But the problem with Hart's argument here, illustrated in part by the numerous definitions he himself offers, is that "support" does not have a precise or limited meaning such that it can be said to have a "common" meaning. *See Webster's Third New Int'l Dictionary* 2297 (2002).[2] Further, its meanings are so broad and varied that any private entity that receives any public funds can be said to be, at least

---

[2] *Webster's* entire definition for the verb "support" is as follows:

"to bear, endure, . . . to carry, convey, . . . to endure . . . to uphold by aid, countenance, or adherence: actively promote the interests or cause of . . . to uphold or defend as valid, right, just, or authoritative . . . to argue in favor of: vote for . . . to advocate; endorse, vote for, or implement the policies, principles, or candidacy of . . . to provide means, force, or strength that is secondary to: back up . . . to give assistance to (a primary battle force) by providing supplies, serving as a reserve, or furnishing additional or covering combat-strength . . . to attend upon (a person) esp.: as an assistant on a ceremomious occasion . . . to act with (a star actor) . . . to provide a musical background for . . . to bid in bridge so as to show support for . . . to serve as verification, corroboration, or substantiation of . . . to provide amplification or clarification of . . . to pay, the costs of: maintain . . . to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining . . . to provide a basis for·the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of . . . to have or put into circulation enough money (as from trade, wages, manufacture, or taxes) to maintain . . . to hold up or in position: serve as a foundation or prop for: bear the weight or stress of: keep from sinking or falling . . . to serve as a heraldic supporter of . . . to give one's arm to . . . to be the subject or ground of . . . to assume and give the appearance of having . . . to maintain (a price) at a high level by purchases or loans . . . to maintain the price of (as an agricultural commodity) by purchases or loans . . . to keep from fainting, sinking, yielding, or losing courage . . . to maintain in condition, action, or existence." *See Webster's Third New Int'l Dictionary* 2297 (2002).

6

in part, "supported" by those public funds. *See id.* But we agree, as does the Attorney General, that simply receiving public funds does not make a private entity a "governmental body" under the PIA. *See Kneeland v. National Collegiate Athletic Ass'n*, 850 F.2d 224, 228 (5th Cir. 1988) ("The Texas Attorney General has concluded that the Act does not apply to 'private persons or businesses simply because they provide specific goods or services under a contract with a government body.'") (quoting Tex. Att'y Gen. No. ORD-1 (1973)). Ultimately, however, this discussion merely demonstrates that the PIA's definition of "governmental body" is susceptible to more than one meaning.

When statutory text is ambiguous, we may resort to rules of construction or statutory aids, including deference to an administrative agency's construction of the statute if that construction is reasonable. *See Texas Citizens*, 336 S.W.3d at 624–25 (agency deference); *Entergy*, 282 S.W.3d at 437 (rules of construction and statutory aids). This deference is especially applicable here because the Legislature requires the Attorney General to determine whether records must be disclosed pursuant to the PIA. *See* Tex. Gov't Code Ann. § 552.306; *Abbott*, 109 S.W.3d at 121; *Rainbow*, 897 S.W.2d at 949; *see also Texas Citizens*, 336 S.W.3d at 624 (noting that we give "serious consideration" and "some deference" to agency's interpretation of a statute it is charged with enforcing" so long as that construction "is reasonable and does not conflict with the statute's language").

Since 1988, Texas Attorney General opinions and open-records letter rulings addressing the scope of "governmental body" under section 552.003(1)(A)(xii) have relied heavily on the analysis used by the federal Fifth Circuit Court of Appeals in *Kneeland*. *See, e.g.*, Tex. Att'y Gen. Op. No. GA-0666 (2008); Tex. Att'y Gen. Op. No. GA-0603 (2008); Tex. Att'y Gen. OR2012-

7

11220; Tex. Att'y Gen. OR2001-4849; Tex. Att'y Gen. LO-97-017 (1997). In *Kneeland*, the Fifth Circuit created a framework, by reviewing the Attorney General's pre-1988 opinions on this issue, for analyzing whether a private entity receiving public funds is a "governmental body" for PIA purposes. *See Kneeland*, 850 F.2d at 228 (reviewing Tex. Att'y Gen. No. ORD 1, Tex. Att'y Gen. No. JM-821 (1987), Tex. Att'y Gen. No. ORD-228 (1979)). *Kneeland*'s reliance on and adherence to Attorney General opinions makes it a useful framework for our analysis here. *See Abbott*, 109 S.W.3d at 121 (noting that deference to Attorney General is especially appropriate in PIA cases).

In *Kneeland,* the Fifth Circuit first noted that a private entity is not a "governmental body" under the PIA "'simply because [it] provides specific goods or services under a contract with a government body.'" *See Kneeland*, 850 F.2d at 228 (quoting Tex. Att'y Gen. No. ORD-1). It then described what it determined were the three fact situations in which the Attorney General had previously determined that a private entity receiving public funds was a "governmental body" under the PIA. From those three fact situations, it formulated what is now referred to as the *Kneeland* test:

> An entity receiving public funds is treated as a governmental body under the PIA—
>
> 1. **unless** the private entity's relationship with the government "imposes a specific and definite obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser";
>
> 2. **if** the private entity's relationship with the government "indicates a common purpose or objective or creates an agency-type relationship between the two"; or
>
> 3. **if** the private entity's relationship with the government "requires the private entity to provide services traditionally provided by governmental bodies."

*See id.* We agree with the Fifth Circuit's analysis of pre-1998 Attorney General opinions on this issue, but more importantly, the Attorney General agrees and has adopted the *Kneeland* analysis and framework as its own, with the proviso that the first of these tests is the primary test for determining whether a private entity is a governmental body. *See* Tex. Att'y Gen. No. GA-0666 ("The primary test, however, is whether the entity receives public funds for the general support of its activities, rather than using those funds to perform a specific and definite obligation . . . If the public funds are used for general support, the entity falls within the definition of "governmental body" under section 552.003(a)(A)(xii) of the Government Code."). Further, in the two decades since the Attorney General first applied *Kneeland*, the Legislature has amended or modified section 552.003(1)'s definition of "governmental body" several times without altering the language at issue here.[3] Thus, we must presume that the Legislature was aware of the Attorney General's interpretation of section 552.003(1)(A)(xii) and adopted it as its own. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 176 (Tex. 2004) ("If an ambiguous statute that has been . . . given a longstanding construction by a proper administrative officer is re-enacted without substantial change, the Legislature is presumed to have been familiar with that interpretation and to have adopted it."). For these reasons and because the analysis is not an unreasonable interpretation of section 552.003(1)(A)(xii) in light of PIA's language and intent—favoring transparency through disclosure—we will defer to the Attorney General and analyze

---

[3] *See* Act of May 20, 2003, 78th Leg., R.S., ch. 1276, § 9.014, 2003 Tex. Gen. Laws 4158, 4218; Act of May 24, 2001, 77th Leg., R.S., ch. 1005, § 2, 2001 Tex. Gen. Laws 2186, 2187; Act of May 17, 2001, 77th Leg., R.S., ch. 632, § 2, 2001 Tex. Gen. Laws 1194, 1194–95; Act of Apr. 23, 1999, 76th Leg., R.S., ch. 62, § 18.24, 1999 Tex. Gen. Laws 127, 403; Act of May 29, 1995, 74th Leg., R.S., ch. 1035, § 2, 1995 Tex. Gen. Laws 5127, 5128; Act of May 20, 1991, 72d Leg., R.S., ch. 306, § 5, 1991 Tex. Gen. Laws 1340, 1341–42.

TAAD's and PTEC's relationships with their public entity members according to the *Kneeland* framework as adopted by the Attorney General. This also seems to be the approach best suited to effectuate the transparency goals of the PIA while not over-burdening private entities that happen to provide goods and services to the government. We will evaluate TAAD and PTEC separately using this framework.

### TAAD

In its sole issue on appeal, TAAD challenges the district court's conclusion that TAAD is a governmental body under the PIA. Specifically, TAAD argues that it is not a governmental entity when analyzed under the *Kneeland* test. We agree.

The first element of the *Kneeland* test is critical to our analysis. *See* Tex. Att'y Gen. No. GA-0666. TAAD's relationship with all its members, including its public-entity members, imposes a specific and definite obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser. *See Kneeland*, 850 F.2d at 228. In return for an annual membership fee, TAAD provides each of its members with a subscription to a bi-monthly newsletter, regular updates on relevant legislative issues, and discounts on an annual conference and education courses that TAAD sponsors. TAAD also provides, to those who purchase them, conference and course registrations, advertising in its newsletter, and books. These services are specific, measurable, and done in exchange for a certain amount of money—i.e., dues or product fees. Hart argues that because TAAD does not have a contract with its members, it does not have a specific obligation to provide these services. We disagree that there is no contract. TAAD's members submit a membership application in which they agree to pay TAAD in return for

10

membership in TAAD and its benefits. By accepting the fees, TAAD becomes obligated to provide the services it offered. In sum, TAAD's relationship with its members, which include public entities, imposes specific and definite obligations on TAAD to provide a measurable amount of service to its members in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser. That aspect of TAAD's structure weighs against it being considered a "governmental body" under the PIA.

Regarding the second part of the test—i.e., does the private entity's relationship with the government indicate a common purpose or objective or create an agency-type relationship between the two—the record shows that TAAD does not share a common purpose or objective with its members, and that it is not an agent for its members. TAAD's purpose is to "promote the effective and efficient functioning of appraisal districts and aid in the improvement of the administration thereof in the State of Texas." While some of its members, specifically its member appraisal districts, may want to achieve or benefit from TAAD's purposes, their own purpose or objective is to *perform* appraisals effectively and efficiently rather than *promote* the same. Also important is the fact that TAAD is a trade organization designed to provide a means for its individual members to share industry-relevant information. Its members, in contrast, are not. Thus, while TAAD and its members share some objectives, they do not have the identity of interest necessary to meet the common-purpose or objective prong of the *Kneeland* test. Likewise, there is nothing in the record to suggest that TAAD is in an agency-type relationship with its appraisal-district members. The only contract that TAAD has with its members is the membership agreement, and that agreement does not suggest that TAAD acts as agent for its members.

11

Finally, TAAD's relationship with its appraisal-district members does not require TAAD to perform services traditionally performed by governmental bodies. It creates newsletters, prepares legislative updates, trains appraisers, puts on conferences, and sells books. Although some governmental bodies may do some or all of these things, none of these are the types of services that one would expect governmental bodies to perform exclusively. Hart suggests that TAAD performs traditional governmental services because if it did not provide training and communication services, the appraisal districts would have to do so. Accepting that argument would render this rule meaningless—e.g., if the State did not purchase its supplies from an outside vendor, it would have to provide them itself.

Based on this analysis, we hold that TAAD is not a governmental body under the PIA. Accordingly, we sustain TAAD's issue on appeal.

### PTEC

In his first cross-issue on appeal, Hart challenges the district court's conclusion that PTEC is not a governmental body under the PIA. Specifically, he contends that under the common meaning of "support" and under the *Kneeland* test, PTEC is supported by public funds. We disagree.

We note first that we addressed and rejected earlier in this opinion Hart's argument regarding the common meaning of "support." And regarding the *Kneeland* test, as discussed above, PTEC's only purpose is to produce educational materials for the property-tax profession. It does not run the seminars or courses, select teachers, or select students. Its sole source of revenue is the licensing fees it receives from those entities that wish to use PTEC's materials. Thus, any public funds PTEC receives are payments made by public entities for licenses to use PTEC's educational materials for those entities' own purposes. In other words, in exchange for a certain amount of

money, PTEC provides the purchaser with the materials PTEC creates. Thus, PTEC's financial relationship with its public-entity members imposes a specific and definite obligation on PTEC to provide a measurable amount of service—a license to use its materials—in exchange for a payment that would be expected in a typical arms-length contract for services between a vendor and purchaser. As such, application of the first prong of the *Kneeland* test weighs against PTEC being considered a "governmental body" under the PIA.

Under the second prong of the *Kneeland* test, we consider whether PTEC's relationship with governmental entities indicates a common purpose or objective or creates an agency-type relationship. We conclude that it does not. PTEC's purpose is to create educational materials and license those materials. The governmental entities that purchase PTEC's materials do so to train their personnel. Those are distinct and separate purposes. Its relationship with the governmental bodies who pay for its materials is in the nature of a vendor to a purchaser. Likewise, there is nothing about these relationships that suggest PTEC is acting as the purchaser's agent.

In the third prong of the *Kneeland* test, we consider whether PTEC's relationship requires it to provide services traditionally provided by governmental bodies. Again, our answer is that it does not. While governmental bodies may create educational materials, that is not a service that would be traditionally provided only by a governmental body.

Hart argues that PTEC's memorandum of understanding with the Comptroller creates both a common purpose and an agency relationship. We disagree. While the memorandum of understanding may state that PTEC agrees to create materials on behalf of and under the direction of the Comptroller, the fact is that it has no obligation to do so; rather, it does these things on behalf of its customers. Further, there is nothing in the record to suggest that PTEC actually acts on the

13

Comptroller's behalf. But even if we were to accept that it did and that PTEC and the Comptroller share a common purpose, the Attorney General has consistently concluded that a private entity is not a "governmental body" if it provides a measurable amount of services in return for public funds from a public entity. *See* Tex. Att'y Gen. No. GA-0666 (holding that first prong of *Kneeland* is primary test); Tex. Att'y Gen. OR2002-4853 (determining that non-profit animal shelter is not governmental body because it provides services in exchange for public funds). To that extent, it is not appropriate to consider PTEC a "governmental body" when it provides a measurable amount of service (educational materials) in exchange for a certain amount of money.

Based on this analysis, we hold that PTEC is not a governmental body under the PIA. Accordingly, we overrule Hart's first issue on appeal.

**Attorney's fees**

Having determined that neither TAAD or PTEC are governmental bodies under the PIA, Hart cannot be considered to have substantially prevailed on the merits of this case. *See* Tex. Gov't Code Ann. § 552.323(a) (allowing district court to assess attorney's fees for a plaintiff who substantially prevails in action to enforce PIA). As such, he is not entitled to attorney's fees under the PIA. *See id.* Accordingly, we overrule Hart's second issue on appeal challenging the district court's refusal to award him attorney's fees.

**CONCLUSION**

Having sustained TAAD's sole issue on appeal, we reverse the district court's judgment regarding TAAD and render judgment that TAAD is not a "governmental body" under

14

the PIA.  Having overruled Hart's two cross-issues, we affirm the remainder of the district court's judgment as modified.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed in part; Reversed and Rendered in part

Filed:   August 31, 2012