# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00130-CV

**Greater Houston Partnership, Appellant**

**v.**

**Greg Abbott, Texas Attorney General; and Jim Jenkins, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-08-004378, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## D I S S E N T I N G   O P I N I O N

I respectfully dissent.

GHP is a private, non-profit entity that acts as a type of "chamber of commerce" to promote economic stability, growth, and public interest in the Houston area. Its principal objectives are to build regional economic prosperity, facilitate business relocations to and expansions in the area, develop and implement international outreach initiatives, and provide strategic planning generally aimed at "promoting and assisting the improvement of commercial, industrial, agricultural, civic, and cultural affairs" of the area. GHP was not founded or created by a public entity, nor does it principally serve one. In fact, its $11.7 million annual budget is overwhelmingly funded by its roughly 2,100 member companies. Nonetheless, the majority concludes that GHP is a "governmental body" subject to forced disclosure of information under the Texas Public Information Act (PIA) merely because GHP executed a contract with the City of Houston to provide—in

exchange for monetary compensation—services to the city that are consistent with GHP's independently established corporate purpose and principal objectives.**[1]** *See* Tex. Gov't Code Ann. § 552.03(1)(A)(xii) (West 2012); *see generally id.* §§ 552.001-.353 (West 2012). I do not believe the legislature intended the PIA to be construed so broadly as to extend its requirements to private entities like GHP merely because they provide services that include intangible deliverables to, and manifest common objectives with, a governmental body.

The PIA does not expressly apply to private entities. On the contrary, it can be applied to a private entity, if at all,**[2]** only by virtue of section 552.003(1)(A)(xii), which defines "governmental body" to include "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or *that is supported in whole or in part by public funds*." *Id.* (emphasis added). The majority's conclusion that GHP qualifies as a "governmental body" under this definition is fundamentally premised on its determination that the term "supported," as used in section 552.003(1)(A)(xii), is ambiguous. *See Greater Houston P'ship v. Abbott*, No. 03-11-00130-CV, slip op. at 8-9 (Tex. App.—Austin Jan. 31, 2013, no pet. h.); s*ee also Texas Assoc. of Appraisal Dists., Inc. v. Hart*, 382 S.W.3d 587, 591-92 (Tex. App.—Austin

---

**[1]** The City paid GHP $785,000 under the contract for 2007-2008 and $885,000 under the contract for 2008-2009. These sums are less than 8% of GHP's annual operating budget.

**[2]** The legislature's intent to include private entities within its scope is a matter of dispute. *Compare Kneeland v. National Collegiate Athletic Assoc.*, 650 F. Supp. 1047, 1057 (W.D. Tex. 1986) (quoting transcript of house debate to support conclusion that legislature intended to include private persons and entities within scope of PIA), *rev'd on other grounds*, 850 F.2d 224 (5th Cir. 1988), *with* Byron C. Keeling, Note, *Attempting to Keep the Tablets Undisclosed: Susceptibility of Private Entities to the Texas Open Records Act*, 41 Baylor L. Rev. 203, 205-06 (1989) (citing transcript of house debate to support conclusion that PIA was intended to apply only to governmental and quasi-governmental entities, not private entities doing business with State).

2

2012, no pet.). Based on this faulty premise, the majority then applies a three-prong "test"—referred to as the "*Kneeland* test"—for determining whether a private entity should be treated as a governmental body under the PIA. This test, which has its origins in a single federal case attempting to construe prior opinions of the Texas Attorney General, is unwieldy, ill-defined, and of dubious origin. Indeed, I believe the analytical principles embodied in the *Kneeland* test produce more uncertainty than clarity in the PIA.

Beyond my reservations about that test, I am equally concerned by the resort to extra-textual analysis in the first instance, because section 552.003(1)(A)(xii) is not ambiguous *when considered in the context of the PIA* as a whole. *Cf. DiFrancesco v. Houston Gen. Ins. Co.*, 858 S.W.2d 595, 597 (Tex. App.—Texarkana 1993, no writ) ("Such contextual definition renders the word operating and the endorsement unambiguous. As limited by the context, it has but one meaning.").

Our primary objective in construing statutes is to give effect to the legislature's intent, which we seek "first and foremost" in the statutory text. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008). Absent legislative definition, we rely on the plain meaning of the text unless a different meaning is apparent from the context or application of the plain language would lead to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008). "Words and phrases shall be read in context and construed according to the rules of grammar and common usage," Tex. Gov't Code Ann. § 311.011 (West 2005), and we look to the entire act in determining the legislature's intent with respect to specific provisions. *Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 628 (Tex. 2011). We do not resort to

3

extra-textual analysis, including deference to agency interpretations, unless the statute in question is ambiguous. *See id.* at 624. In this case, I believe the statute is not ambiguous.

The term "support" obviously has a variety of dictionary definitions. *See Hart*, 382 S.W.3d at 591-92. As this Court has recognized, however, dictionaries provide an inadequate test for ambiguity:

> To allow the existence of more than one dictionary definition to be the *sine qua non* of ambiguity would eliminate contextual analysis . . . . Dictionaries define words in the abstract, while courts must determine the meaning of terms in a particular context . . . . Dictionary definitions alone can therefore be accorded little weight in determining ambiguity. The fact that different people reading different dictionary definitions of the same word might reach different interpretations of that word does not make each reading and interpretation reasonable. We agree with those courts holding that such definitions provide no significant help in determining whether a term has two reasonable meanings.

*Gulf Metals Indus. v. Chicago Ins. Co.*, 993 S.W.2d 800, 806 (Tex. App.—Austin 1999, pet. denied). A statute is not ambiguous unless it is susceptible to more than one *reasonable* meaning. *See In re Missouri Pac. R.R. Co.*, 998 S.W.2d 212, 217 (Tex. 1999) ("The language of the statute could support more than one reasonable interpretation and therefore is ambiguous."). And the context of a term is crucial in determining the reasonableness of its potential meanings. *See Gulf Metals*, 993 S.W.2d at 806. When considered in light of the PIA's purpose, I believe section 552.003(A)(1)(xii) has but one reasonable meaning.

The Texas Legislature enacted the PIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." Gov't Code § 552.001(a); *Jackson v. State Office of Admin. Hearings*,

351 S.W.3d 290, 293 (Tex. 2011). These foundational principles, which provide the prism through which the PIA's words must be construed, reflect a legislative intent to apply the statute to traditional governmental entities, and perhaps as well to governmental entities masquerading as "private organizations," but not to privately controlled and operated organizations performing services or providing goods under bona fide government contracts. When viewed in the context of the PIA's stated purpose, the only reasonable construction of the phrase "supported . . . by" in section 552.003(A)(1)(xii) is that it was intended to describe or identify entities that were created or exist to carry out governmental functions and whose existence are maintained in whole or in part with public funds. If an organization, corporation, commission, committee, institution, or agency is not acting as a functional equivalent of a governmental entity but rather is providing goods or performing services pursuant to a quid pro quo contract, it is not being "supported by" public funds and thus does not qualify as a "governmental body" under section 552.003(A)(1)(xii). Because I believe this provision of the PIA is unambiguous, I would not apply the so-called *Kneeland* test but would instead conclude that under the plain meaning of the statute, GHP is not a governmental body subject to the PIA's requirements.

In any event, even if the statute were ambiguous, I would not apply the test articulated by the majority. The "*Kneeland* test" originated in a 1986 federal district court opinion that attempted to distill two patterns of analysis from a handful of Texas Attorney General opinions issued during the preceding decade that relied on ad hoc determinations of fact-specific scenarios in considering whether ostensibly private entities were subject to the disclosure requirements of the

5

PIA's predecessor statute. The court summarized the analytical principles it gleaned from those

attorney general opinions as follows:

> If a contract imposes a specific and definite obligation on the private contractor to provide "a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms length contract for services between a vendor and purchaser . . .," the private contractor will not be subject to the Act. [TEX. ATT'Y GEN.] ORD-302 (1982). Further, the contract must contain no provision which either indicates a common purpose or objective between the purported governmental body and the public entity with which it contracts, or could be construed as constituting an agency-type relationship. TEX. ATT'Y GEN. ORD-228 (1979).[3]

*Kneeland v. National Collegiate Athletic Assoc.*, 650 F. Supp. 1047, 1057 (W.D. Tex. 1986), *rev'd*

850 F.2d 224 (5th Cir. 1988). The principles articulated in the quoted passage correlate to the first

and second prongs of the test applied by the majority. With these principles in mind, the federal

district court in *Kneeland* determined that the National Collegiate Athletic Association (NCAA) and

Southwest Athletic Conference (SWC) were governmental bodies because they received public funds

in the form of dues payments from public universities, shared proceeds of the universities' football

television gross rights fees, and required the universities to absorb costs, expenses, and salaries when

they hosted NCAA tournaments and championships and when university employees did work for

the NCAA. *See generally id.* at 1059-63. On appeal, the Fifth Circuit came to the opposite

---

[3] It is worth noting that the cited attorney general opinion, ORD-228, nowhere mentions "an agency-type relationship" or even the words agency, agent, or principal. *See* Tex. Att'y Gen. Ord-228 (1979). Nor is that phrase found in any preceding attorney general interpreting the pertinent definition of "governmental body." The term first makes its appearance in 1987 in an attorney general opinion that cites both *Kneeland* and ORD-228 as its source. *See* Tex. Att'y Gen. No. JM-821 (1987).

6

conclusion even after applying the same analytical constructs identified by the lower court.[4] *Kneeland v. National Collegiate Athletic Assoc.*, 850 F.2d 224, 229-31 (5th Cir. 1988). In the nearly 25 years since *Kneeland*, the attorney general's office has reflexively cited and applied the standards articulated in those opinions, and this Court recently adopted the test out of deference to the attorney general. *See Hart*, 382 S.W.3d at 592-93.

In my opinion, the *Kneeland* test is ill-conceived, not particularly well thought out, and did not originate from bedrock principles of statutory construction. Some of the concerns I have about the "*Kneeland* test" are that (1) the test did not derive from careful consideration of the statute's language or purpose but instead was derived by amalgamating a hodgepodge of ad hoc administrative conclusions synthesized through judicial gloss into a test of questionable meaning; (2) in that vein, the phrase "agency-type relationship" is an invention of the federal district court that remains undefined in any measurable sense by the attorney general; (3) although it may be a relatively simple matter to trace and correlate payments of government dollars for "a measurable amount" of tangible deliverables, the same cannot be said of payments for intangible services, which often are provided with minimum restrictions or even guidelines—the services of attorneys and lobbyists come to mind—yet the "*Kneeland* test" places the burden on the service provider to prove

---

[4] Although not relevant to the analysis in that case, the Fifth Circuit also professed to have identified a third analytical pattern, which it derived from an intervening attorney general opinion that relied on *Kneeland* for its analysis. That analytical principle, which is stated as the third prong of the test the majority applies here, states that "some entities, such as volunteer fire departments, will be considered governmental bodies if they provide 'services traditionally provided by governmental bodies.'" *Kneeland v. National Collegiate Athletic Assoc.*, 850 F.2d 224, 229 (5th Cir. 1988) (quoting Tex. Att'y Gen. No. JM-821 (1987)).

an indeterminate level of specificity; and (4) the test gives too much weight to commonality of purpose or objective without relating the significance of that circumstance to the statute's purposes.

Although this Court has acknowledged that the legislature did not intend to subject every entity receiving government payments to the PIA's requirements, *see Hart*, 382 S.W.3d at 592, the majority here applies a test that is so nebulous in its meaning and scope that it can easily be used to reach information about which the public has no inherent or legitimate right to know. *See* Gov't Code § 552.001 (fundamental policy underlying the PIA is public's right to complete information about affairs of government and official acts of public officials and employees). Such interference in the affairs of private entities could not have been the legislature's intent and cannot be justified merely by reliance on the PIA's dictate of liberal construction. *See id.* ("This chapter shall be liberally construed in favor of granting a request for information."). In the only law-review commentary specifically addressing this issue, the author came to the following conclusion:

> Read in light of its declaration of purpose and legislative history, the Texas Open Records Act [the predecessor to the PIA] does not apply to purely private entities. Section 2(1)(F) [the predecessor to section 552.003(1)(A)(xii)] of the Act comprehends that quasi-governmental agencies or operations will be bound by the Act's broad disclosure requirements. Unfortunately, in a series of opinions which reflect a careless approach to statutory construction, two attorneys general have interpreted section 2(1)(F) to include within the scope of the Act any private entity which has received public funds for its support. These opinions are purportedly based upon a rule of liberal construction embodied in the Open Records Act. Such a rule, however, has never allowed statutory interpretations that are not reasonably consistent with legislative intent.

Byron C. Keeling, Note, *Attempting to Keep the Tablets Undisclosed: Susceptibility of Private Entities to the Texas Open Records Act*, 41 Baylor L. Rev. 203, 227 (1989).

Fundamentally, I believe section 552.003(1)(A)(xii) of the PIA, including the term "supported," is not ambiguous; within the context of the PIA, a private company that receives payment for services rendered under a bona fide government contract is not being "supported by" public funds. Accordingly, I would not defer to the attorney general's interpretation of that provision. Instead, applying the only reasonable interpretation of the term in context, I would conclude that GHP is not "supported by" the City of Houston, is therefore not a governmental body, and thus is not subject to disclosure of the requested information under the PIA. Because the majority concludes otherwise, I respectfully dissent.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Filed: January 31, 2013

9